# Goodrich and Hick's Appeal.

1. A fund constituting assets of an insolvent insurance company, produced under a contract of re-insurance of its risks with another insurance company, is distributable pro rata to all the creditors of such insolvent company; the individuals insured, for the destruction of whose property the fund was paid by the re-insuring company, have no right to a preference in distribution.

2. It is competent, however, for an insurance company to contract with another insurance company to re-insure certain of its risks for the particular indemnity of individuals insured; and in such case the latter may claim the fund to the exclusion of general creditors.

3. The particular contract in this case held to be a general contract of re-insurance, and the fund derived therefrom was therefore distributable pro rata to all the creditors.

March 26th, 1885. Before Mercur, C. J., Gordon, Paxson, Trunkey, Sterrett and Clark, JJ. Green, J., absent.

Appeal from the Court of Common Pleas No. 1, of *Philadelphia county:* Of July Term 1884, No. 128.

This was an appeal by Henry C. Goodrich and William B. Nevins, trading as Goodrich & Nevins, and Ralph Hicks, Richard Sinnot and Alfred Grissom, Jr., owners of the steamer "Mary Bell," from a decree of said court, confirming the report of an Auditor appointed to report distribution of a fund constituting assets of the Penn Fire Insurance Company, an insolvent corporation.

The appellants had suffered loss under policies of fire insurance held by them in said company, and, for the reasons hereinafter mentioned, claimed a preference over general creditors of the company in the distribution of this fund; but the court below decided that their right to participate was only pro rata, with general creditors.

The facts were these: The Penn Fire Insurance Company,

was doing business in Philadelphia in January, 1876. On the 31st of that month the insurance commissioner informed the Attorney General of the state of Pennsylvania, by letter, that he had reason to believe the company was insolvent. On the same day the company was notified to discontinue business. On February 2d, 1876, the Attorney General filed an information in the Common Pleas No. 1, of Philadelphia county, with suggestion that the court make an order to require said company to show cause why its business should not be closed. Two days thereafter the directors passed a resolution that the president of the company be instructed to notify all its agents to cease issuing policies, which was done by circular of that date.

Thereupon the company, by permission of the insurance commissioner, made an agreement for re-insuring its outstanding risks with the local agents of a French insurance company, briefly styled *La Caisse Générale* the nature of which agreement was evidenced by the two following instruments in writing, viz.

I.

"PHILADELPHIA, February 26th, 1876.

"Received from the Penn Fire Insurance Company the sum of $10,000, in consideration of which a policy of insurance is to be issued by La Caisse Générale des Assurances Agricoles et des Assurances Contre l'incendie, re-insuring the outstanding risks of the said Penn Fire Insurance Company, as per letter February 25th, 1876, from February 26th, 1876, at noon, according to the following conditions, viz :—That the said Penn Fire Insurance Company shall pay to the said Caisse Générale des Assurances the amount over and above $10,000 necessary to re-insure its outstanding risks on or before the expiration of sixty (60) days from this date, and if such additional payment is not made at or before said time all the liability of said Caisse Générale des Assurances, &c., shall cease and determine.

"*In Witness Whereof*, We have hereunto set our hands, this twenty-sixth day of February, A. D. 1876.

"W. NEVIN KREMER,
"JAS. L. FERRIERE,
"*Directors and Attorneys in fact.*"

II.

It is hereby mutually contracted and agreed by and between the Caisse Générale des Assurances Agricoles et des Assurances Contre l'incendie and the Penn Fire Insurance Company, that the policy of re-insurance to be issued to the Penn Fire Insurance Company shall be on the following conditions, viz :

That the premiums to be paid to said Caisse Générale, &c., shall be a sum equal to the entire unearned premiums of the outstanding policies of the Penn Fire Insurance Company, less twenty per cent.   The payment of $10,000 on account of said premiums, the receipt of which is hereby acknowledged, shall be made on delivery of policy; that the balance shall be paid by two notes of equal amounts—payable one in *forty days* and the other in *sixty days*, without grace, from the twenty-sixth day of February, A. D. 1876, with interest; that if either of the said notes is not paid at maturity, then all the liability of the said Caisse Générale, &c., under the said policy shall immediately cease and determine, and the said policy shall be void and of no effect from that time.

That the said Penn Fire Insurance Company will turn over to the said Caisse Générale its original registers, books, reports, and other papers in any way relating to the policies thereby re-insured.

That the said Caisse Générale will assume the care and expense of the adjustment of all losses which may occur under the policies of the said Penn Fire Insurance Company which are thereby to be re-insured.

Witness our hands at Philadelphia, the twenty-eighth day of February, A. D. 1876.

WM. NEVIN KREMER,
JAMES L. FERRIERE,
*Attorneys in Fact for the Caisse Générale.*

WM. RUSH WARNER,
*President, Assistant Member of Committee.*
THOS. F. BLAKENAN,
*Member of Committee appointed by Directors.*

In the report of the insurance commissioner for 1876 this agreement, and the failure of the Penn Fire Insurance Company to carry out its terms, was referred to in the following terms:—

"After the order to suspend business, the company was permitted to effect a re-insurance of its outstanding policies with the French corporation, for sixty days, with the hope that its available funds would prove sufficient to complete the re-insurance at the expiration of that time.   But money could not be readily raised upon the mortgage securities, and the money derived from convertible stocks and bonds was absorbed in the settlement of claims and expenses, which of course were much greater than was anticipated.   Finally, the policies were cancelled at the expiration of the temporary re-insurance and certificates of indebtedness issued for the return premiums."

Within the forty days mentioned in the agreement, the

properties of the appellants, covered by their policies in the Penn Fire Insurance Company, were totally destroyed by fire. Notice and proofs of loss were furnished to the Penn Fire Insurance Company, and the president of that company, on March 31st, 1876, notified La Caisse Générale of the loss, saying in his letter, "I am sorry to trouble you and regret so many losses have occurred on your contract."

The Auditor's report contained the following:—"The fund of $6000 before mentioned was obtained in compromise of a suit which was brought by the receiver of the Penn Fire Insurance Company, against the French corporation, La Caisse Générale, &c., on the contract before set out, to recover the aggregate of losses which occurred during the forty days when the contract was operative under policies of insurance which had been issued by the Penn Fire Insurance Company. This suit was based upon the theory that the liability of La Caisse Générale, &c., on its contract was to the other corporation.

"In point of fact, the French Company had settled a large portion of the losses referred to directly with the policy-holders, and, as I infer from the papers before me, the amount of such losses which had not been so settled was but little less than the amount paid in compromise."

Before the Auditor, the appellants claimed that this fund should be applied to the payment of their claims in full, to the exclusion of other creditors of the company, on the ground that the contract with the French Company is to be treated as an agreement that the latter should re-insure the several policy-holders of the Penn against loss, and that these policy-holders are entitled to be regarded as *cestuis qui trustent* or principals, who, though they did not know of the re-insurance until after it was made, or direct it to be made, have the right to ratify what was done and claim the benefit of it for themselves, specifically and exclusively.

The Auditor reported, inter alia, as follows: "I do not doubt that it is competent, in many cases, for an insurance company to make a contract of re-insurance with another like company, for the benefit of its policy-holders, and in such a manner that they, the policy-holders, can claim the advantage of such re-insurance for themselves, directly and exclusively. I am not disposed to deny that the corporation in question had such a power, although in view of the fact that proceedings were in progress for its dissolution, I regard it as a very serious question, whether it could have taken a large part of its assets to purchase an immunity for the exclusive benefit of a portion of its policy-holders. However that may be, as I understand the law, a contract of re-insurance made by an insurance company to cover risks which it has assumed, will

never be treated as a contract for the sole benefit of the holders of the policies creating such risks, except when the provisions of the contract itself are of such a character as show clearly and expressly that it was made for their benefit and not for the advantage of the company, or unless, possibly, it can be made to appear that for some proper consideration moving from the assured to the company effecting the re-insurance, it was agreed between them that such re-insurance should be for their exclusive benefit. It is urged upon me that it is evident from the whole transaction that the Penn Company expected to go out of business, and that it was endeavoring to protect its policy-holders by the contract which it made with the French Company. Doubtless this is true to a large degree, and perhaps to the entire extent claimed, but I am unable to see how this *general purpose* which appears from attendant circumstances, principally, can be made to operate as a contract or as the creation of a trust. In my judgment, before such a result would be reached as is contended, the particular purpose must appear, affirmatively and definitely, in the very terms of the contract of re-insurance. As I read and understand the agreement between the two companies, it only related to obligations and rights of the corporations, and did not undertake to regard the rights of policy-holders, except through their relation to the re-insured company. . . . . . It cannot be successfully maintained, in my opinion, that the contract in question either provided, or intended to provide, that the French corporations should issue a policy to the holders of policies in the Penn Company, severally or as a class, or that the former should pay to the policy-holders of the latter the amounts of their losses directly, and not as the agents of the latter. The French Company undertook to re-insure " its " (the Penn's) " outstanding risks;" that is, as I understand it, to re-insure or indemnify it—the *Penn Company*—against losses occurring under its policies.

The fact that the books and papers of the Penn Company were placed in the custody of the other corporation is undoubtedly consistent with an undertaking on the part of the latter directly, and only for the benefit of the holders of policies of the former, if such a contract had been made, but it does not tend to prove that it was made. On the other hand, such custody was a proper thing for the French corporation to require, inasmuch as it only became bound for the amount of losses which could be enforced as claims under the policies, and it was natural that it should ask to have the material at hand to test each case as it might arise.

The Auditor therefore reported against giving a preference to the said claimants on the fund.

[Goodrich and Hick's Appeal.]

Exceptions to the Auditor's report were overruled by the court, and a decree was entered confirming the report. The appellants took this appeal assigning for error this action of the court.

*Angelo T. Freedley* and *William Henry Rawle,* for the appellants, argued that upon the ground of public policy, as indicated by the several provisions of the Insurance Act of April 4th, 1873 (P. L. 22), as well as upon the construction of the contract, the court should have decided that the fund, which was produced by reason of the destruction of the appellants' property, should be appropriated to pay the appellants' losses.

*George Tucker Bispham,* for the appellees.—The question is simply one of interpretation of the contract. The $10,000, paid by the Penn Company for the re-insurance, was taken out of the general assets of the company; if not so taken, it would have increased the dividends of the general creditors, and the insurance money, though in one sense obtained because of the destruction of appellants' property, should be distributed pro rata to the appellants in common with other creditors.

Mr. Justice CLARK delivered the opinion of the court, October 5th, 1885.

The only question raised by the several assignments of error, in this case, is whether or not, in the distribution of the assets of the Penn Fire Insurance Company of Philadelphia, in the hands of an assignee, the appellants are entitled to any preference over the general creditors of the company. The preference claimed is as to the fund of $6000 received on settlement or compromise, with the French corporation known as " La Caisse Générale des Assurances Agricoles et contre l'Incendie." It is unfortunate, perhaps, that the formal policy provided for in the agreement, between the Caisse Générale &c. and the Penn Company was never issued, as the true intent of the contracting parties would doubtless have been therein more fully disclosed ; but this was not done, and we must learn that intent and determine the rights of the contending parties, upon the fair "reading and construction of the executory contract, evidenced by the writings of 26th and 28th February, 1876."

In the agreement of 26th February, 1876, the receipt of $10,000 is acknowledged ; in consideration of which " a policy of insurance " is to be issued by La Caisse Générale &c., " re-insuring the outstanding risks of the Penn Fire Insurance Company " &c ; " the amount over and above $10,000,

necessary to 're-insure' its outstanding risks to be paid" &c. In the more full and formal contract, made two days later, it is provided that the "policy of re-insurance" to be issued shall be subject to certain conditions, &c.

Re-insurance is properly applied to an insurance effected by one underwriter with another, the latter wholly or partially indemnifying the former against the risks which he has assumed; that is to say, after an insurance has been effected, the insurer may have the subject of insurance re-insured to him by some other. There is in such case, however, no privity between the original insured and the re-insurer; the latter is in no respect liable to the former, as a surety or otherwise, the contract of insurance and of re-insurance being totally distinct and disconnected. But whilst the contract is one of indemnity simply, in which the insurer is to be protected to the extent of his loss, when the loss is incurred and ascertained, the re-insurer must pay the amount. The insurer may at once, without payment to the original assured, resort to his action: Fame Ins. Co.'s Appeal, 83 Penn. St., 396. Even if the insurer fail, or become insolvent so that his insured receives only a dividend however small, the re-insurer can gain nothing by this, but must pay the amount of the loss to the first insurer: Hastie v. De Peyster, 3 Caines, 190; Hone v. Mut. Saf. Ins. Co., 1 Sand. Sup. Ct. N. Y., 137, affirmed in Court of Appeals, sub nom. Mut. Saf. Co. v. Hone, 2 Comst., 235; 3 Kent Com., 279; Marshall on Ins., 143. So in Herckenrath v. Am. Ins. Co., 3 Barb. (N. Y.) Ch., 63. Chancellor WALWORTH decided that where an insurance company has underwritten a policy, and afterwards causes itself to be re-insured, and after the loss of the property insured, such company becomes insolvent, the person originally insured has no equitable lien upon the sum of money due on the contract of re-insurance; but the fund belongs to all the creditors of the insolvent company ratably." These are familiar principles of insurance law, and are not now any where doubted.

If therefore the contract between La Caisse Générale &c. and the Penn Fire Insurance Company was for a policy of re-insurance, properly so called, the appellants could have no preferable claim or lien upon the fund in question, although the Penn Company was admittedly and hopelessly insolvent.

It is contended, however, by the appellants, that the contract in question, when read in the light of the facts attending its execution, cannot in any strict sense be considered a contract for re-insurance; that it was not intended to provide indemnity to the company, but to the individual policy-holders, and that the policy-holders can claim the advantage of this so-called re-insurance for themselves, directly and exclusively; that the

13 OUTERBRIDGE—34

term, "re-insurance" was not used in its legal or technical sense but in a different sense, defined by the particular facts which induced the creation of the contract, and that the re-insurance by the Caisse Générale &c., was in fact, although not so expressed, a conditional assumption of the business of the Penn Company.

It was competent, we think, for the Penn Company acting in the interest of its general policy-holders with or without authority, in view of insolvency and without fraud, to effect an indemnity for their individual protection, in case of loss, (Glen *v*. Hope Mut. Co., 56 N. Y., 379; Fischer *v*. Same, 69 N. Y., 161) which, even after loss, they might ratify and approve, (Fleming *v*. Mar. Ins. Co., 4 Wh., 59; Stillwell *v*. Staples, 19 N. Y., 405; 1 Amer. Lead. Cas., 844); and, if the insurance was in their interest, directly for their benefit, and free from any additional burden or obligation on their part, ratification might be presumed. But we fail to find anything in the words of the contract, in the special circumstances attending its creation, in the nature of the transaction itself, or in any rule of public policy, that would justify us in saying that the contract was any other than a contract of re-insurance, in the proper sense of that term. The contract was written by and between persons on both sides, actually engaged in the business of insurance, persons conversant doubtless with the meaning of terms employed in the practice of insurance, and the presumption is a fair and reasonable one, that words of technical or special import were by them properly applied. The words "re-insure" and "re-insurance" would therefore seem in the first instance at least to characterize the contract and to point out the object and purpose of the parties. The proper signification of these terms would, of course, vary with the clearly manifested intention of the parties. But the contract is with the Penn Company, for a consideration moving from it providing for a policy to the Penn Company, to re-insure its risks. There is no provision whatever, expressed in the contract, for the individual indemnity of the policy-holders nor for the insurance of their property for them; the re-insurance is expressly upon the "outstanding risks" of the company. The contract of re-insurance, in some sense perhaps operates upon the property itself rather than the risk, but the fact that the policy was to be upon the "risks," indicates that it was the company's insurable interest in the property, which formed the basis of the insurance.

It is true, that except for the appellant's losses by fire, the fund of $6000 would not have been realized, but this is incident to all cases of re-insurance. It is true, also, that the re-insurance was of all the outstanding risks of the company, and

not as is usually the case, of any particular part of them; but whether a company shall re-insure the whole or only a part of its risks, is a question of policy for the company, dependent upon its purposes for the future, or its circumstances. If the underwriter wishes to change his business, or to quit the country, or to avert insolvency, he may choose to re-insure the whole; under different circumstances he may choose to indemnify himself as to part only. The provisions that the Penn Company " will turn over to the Caisse Générale its original registers, books, reports, and other papers, in any way relating to the policies thereby insured," and, " that the Caisse Générale will assume the care and expense of the adjustment of all losses which may occur under the policies of the said Penn Fire Insurance Company, which are thereby to be re-insured," are consistent, we think, with either theory of the case—as consistent with one as with the other; and they, therefore, prove nothing either way. Such a course of proceeding may be rare, but cases are rare perhaps when the re-insurance is upon the whole list of the underwriters' risks, and where this is the case there can certainly be nothing unreasonable in the provision. We think there is nothing on the face of the contract itself, to give it the effect claimed for it, and we can discover nothing in the facts which led up to its execution, which would evidence any intention of the parties different from what is plainly expressed.

The inducing cause of the contract, doubtless, was the proceeding instituted by the Attorney General, at the instance of the Insurance Commissioner. After the order to suspend business, the company was permitted to effect a re-insurance of its outstanding policies, &c., for sixty days, with the hope that its available funds would prove sufficient to complete the re-insurance, at the expiration of that time. Had these hopes been realized, it is probable that the decree of dissolution, during the period of re-insurance at least might not have been entered. The commissioner, in his report refers, it is true, to this contract as an effort of the company to " secure its policy-holders by re-insurance," but if the contract were, in fact, otherwise, the report of the commissioner, subsequently made, could not change its provisions, or alter its effect. The Caisse Générale, &c., in paying certain of the losses directly to the policy-holders, would seem, subsequently to have put a construction on the contract, conformable to the appellants' claim; but the effect of this is certainly overcome by the fact that the Penn Company repudiated this payment by bringing suit against the Caisse Générale &c., and the fund now for distribution is the result of that action.

To sustain the appellants' contention in this case, the fact

should clearly appear, either by the contract, or otherwise in the transaction, that the indemnity provided was to the policy-holders directly, and in the absence of such proof their claim of preference must be disregarded.

The case of Glen *v.* Hope Mut. Ins. Co., supra, is greatly relied on by the appellants, but that case is materially different from this. By a contract duly executed, the Hope agreed to re-insure the Craftsman Company, on all risks for which its policies were outstanding; and, also, to assume all such policies, and to pay the holders thereof all such sums as the Craftsman might, by force of such policies, become liable to pay. The engagement to the policy-holders was direct and express, and the liability was therefore direct and exclusive. This case was followed by Fischer *v.* Hope Mut. Ins. Co., supra, which was another action on the same contract, and the rulings in the former case were in the latter recognized and approved.

> The decree of the Court of Common Pleas is affirmed, and the appeal is dismissed at the costs of the appellant.