**USX CORPORATION and Bessemer and Lake Erie Railroad Company, Plaintiffs,**

v.

**ADRIATIC INSURANCE COMPANY, et al., Defendants,**

v.

**Icarom, Formerly known as Insurance Corporation of Ireland, Additional Defendants.**

**No. CIV.A. 95–866.**

United States District Court, W.D. Pennsylvania.

Sept. 30, 1998.

---

470

J. Michael Jarboe, David A. Lynch, USX Corporation, Law Department, Pittsburgh, PA, James J. Restivo, Jr., Lawrence E. Flatley, Debra H. Dermody, George L. Stewart, II, Reed Smith Shaw & McClay, Pittsburgh, PA, for Plaintiffs.

David B. Fawcett, Richard S. Dorfzaun, Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, Bernard D. Marcus, Robert L. Allman, II, Scott D. Livingston, Marcus & Shapira LLP, Pittsburgh, PA, for Defenadants.

## OPINION

DIAMOND, District Judge.

Plaintiffs commenced this action seeking indemnification under approximately 278 umbrella and excess policies of insurance for financial losses in excess of $590,218,-296.92 which plaintiffs incurred as a result of judgments and civil suit settlements following a criminal conviction and the entry of civil judgments against plaintiff Bessem-

er & Lake Erie Railroad Company ("B & LE") arising out of its participation in a twenty year conspiracy to violate federal and state antitrust laws. Presently before the court is plaintiffs' motion to amend complaint to add "Equitas" as a party.[1] For the reasons set forth below, the motion will be denied.

Plaintiffs seek to add Equitas to this breach of insurance contract litigation pursuant to the theory that these entities have become directly responsible for any liabilities arising out of certain policies at issue. Plaintiffs argue that under the doctrine of assignment and delegation the London Defendants have transferred their contractual responsibilities in a manner which permits plaintiffs to assert a direct action against Equitas because of the central role it now plays in handling, settling and ultimately paying for claims under the policies.[2] Plaintiffs aver that the London Defendants contractually have delegated the responsibility to perform a duty owing to plaintiffs, the delegee has accepted that obligation and as a result the delegee is now directly liable to plaintiffs for the performance of the original contract obligation. The London Defendants oppose the motion on the ground that the contract under which plaintiffs seek to establish an enforceable delegation merely is a contract of reinsurance which fails to provide plaintiffs with the right to compel actual performance from the reinsurer.

Placing the parties' arguments in proper context requires an understanding of the way in which insurance policies are underwritten at Lloyd's. Lloyd's is not an insurance company, but instead is a central location which functions as a marketplace where various investors buy and sell insurance risks. These investors are individuals who commonly are referred to as "Names." Names invests funds and pledge assets as security for risks offered in the market.

To become a Name, a person must pledge personal assets and sign a membership agreement with Lloyd's. The insurance obtained is thus secured by the Names, who are liable on the policy "down to their last cufflinks." *Employers Insurance of Wausau, a Mutual Company v. Central London Market Companies, et al.,* Civil Action 97–409 (W.D.Wisc. October 27, 1997), at p. 4, *reprinted at* Exhibit H of Appendix to London Defendants' Opposition (Document 285). The British Parliament has established a central authority to oversee the market and a central fund has been created to protect the insurance purchased in the event that a Name defaults. *Id.* at 5.

Names participate in underwriting risks by appointing a managing agent. The managing agent employs an underwriter who assesses and underwrites risks for a given group of Names. Each Name is severally, but not jointly, liable to the insured for the risk undertaken on any particular policy.

Names organize into syndicates which perform collectively many of the administrative tasks of underwriting and servicing the policies. The Names appoint agents to handle the technical aspects of brokerage and risk and premium estimation. Syndicates bundle the risks underwritten by other syndicates over an accounting year, in effect reinsuring other syndicates.

Policies are "closed" on a periodic basis (usually every three years) and the profits or losses are allocated among the participating Names. When a policy period expires, the managing agent is responsible for estimating the amount, if any, which

---

1. Equitas principally is comprised of two companies, Equitas Reinsurance, Ltd. and Equitas, Ltd. The term also includes Equitas Holdings, Ltd., Equitas Management Services, Ltd. and Equitas Policyholders Trustee, Ltd. All Equitas entities were created under English law. *See* Plaintiffs' Brief in Support (Document 277) at p. 1 n. 1.

2. The London Defendants are 124 syndicates at Lloyd's London ("Lloyd's") and 44 companies in the London insurance market which subscribed, severally, to shares of 28 London market insurance policies at issue.

the insured is or may be entitled to receive under the policy. The managing agent undertakes a process of "closing" the account and in this process considers the insured's reported claims as well as any losses which have been incurred that have not yet been reported as claims. A managing agent may spread the Names' risk of making additional payments on a closed policy by reinsuring the policy with other Names doing business at Lloyd's in the amount of the estimated additional future payments. This process commonly is understood as "reinsurance-to-close" and in this way the Names who issued policies remain liable on the account, but the reinsurance coverage functions as a source from which the Names may seek indemnity in the event additional payments are required on a closed policy. *See Long Island Lighting Co. v. Aetna Casualty & Surety Co.*, Civil Action 96–9664, 1997 WL 567342 (S.D.N.Y. Sept. 11, 1997), *reprinted at* Exhibit E of Appendix to London Defendants' Opposition.

In the late 1980's and early 1990's Lloyd's experienced unprecedented losses from asbestos and pollution claims, the questionable underwriting of excess reinsurance treaties and a string of catastrophic events. Plaintiffs' Brief in Support at p. 5. The estimate for the losses for years prior to 1993 totaled approximately $22 billion. *Id.* The losses threatened the collapse of the entire market. A large number of Names instituted numerous actions in the United Kingdom and the United States against Lloyd's, managing agents, members agents, errors & omissions insurers, auditors and Lloyd's brokers. *See generally* Lloyd's Reconstruction and Renewal Settlement Offer (July 1996) at pp. 22–26 *reprinted at* Tab B of Plaintiffs' Appendix in Support. In the face of the increasing inability to close on prior policy

years in the traditional manner and the threat of the collapse of the entire market, the counsel of Lloyd's developed a plan for "reconstruction and renewal." The group of entities which the parties commonly refer to as Equitas were established in order to contain the potential long-term losses and liabilities that had arisen. The plan provided for settlement of all pending litigation commenced by the Names.

Funding for Equitas came from various financial arrangements under a debt-credit package and a write-off by Lloyd's of central fund debt owed by the Names, which in turn resulted in the transfer of part of the central fund to a new central fund created by Equitas. Additional funding came from various other sources interested in terminating the litigation commenced by the Names, including contributions by managing agents, members' agents, errors and omissions insurance, auditors and Lloyd's brokers. *Id.* The entire assets from the program of renewal were transferred to a discretionary trust solely for the benefit of the Names. The Names do not hold shares in the trust, but the trustees are required to act in the interests of the reinsured Names. *See* Report & Accounts for the Period Ending 4 September 1996 at p. 4 *reprinted* at Tab A in Plaintiffs' Appendix in Support. Funding for Equitas also came about as a result of the transfer of syndicate reserves and reinsurance previously obtained for pre–1993 account years.

The creation of Equitas and the resolution of the litigation as well as the transfer of all assets and reinsurance associated with the risks undertaken by Equitas were accomplished pursuant to a "Reinsurance and Run-off Contract" dated September 3, 1996 ("reinsurance contract").[3] The essence of the agreement is as follows:

---

**3.** The parties to the reinsurance and run-off contract were Equitas Reinsurance Ltd., Additional Underwriting Agencies (No. 9) Ltd., the underwriting members of Lloyd's consisting of a group of syndicates listed in a schedule, the underwriting members of Lloyd's consisting of syndicates reinsured-to-close in their capacities as members of one or more of the closed year syndicates, Lloyd's, Equitas Ltd., Additional Underwriting Agencies (No. 10) Ltd., and Equitas Policyholders Trustee Ltd. *See* Reinsurance and Run–Off Contract at p. 1 *reprinted at* Tab C of the London Defendants' Appendix in Opposition.

## THE REINSURANCE OBLIGATION

### Scope of reinsurance obligation

3.1 [Equitas] shall, in consideration of:

(a) the obligation to transfer the Segregated Account Assets held in respect of each and every Syndicate;

(b) the obligation of the Names to pay their Names' Premiums;

(c) the obligation of the Names to assign the rights granted to [Equitas] pursuant to clause 6 [Syndicate Reinsurances, Financial Reinsurances and other Returns]; and

(d) the obligation of the Names to assign the rights specified in clause 5.1(d) [various trust accounts],

reinsure and indemnify each and every Syndicate and each Closed Year Syndicate by payment in accordance with clause 3.4 and otherwise upon and subject to the terms and conditions of this Agreement.

3.2 The reinsurance and indemnity obligation of [Equitas] shall be to indemnify without limitation in time and amount ... each Syndicate and each Closed Year Syndicate ... by way of reinsurance, in respect of all liabilities, losses, claims, returns, reinsurance premiums, costs and other liabilities including extra-contractual obligations or punitive or penal damages arising in relation to the Syndicate 1992 and Prior Business of that Syndicate or Closed Year Syndicate, after deduction of:

(a) all amounts recoverable and actually recovered after the Effective Date in respect of the relevant Syndicate Reinsurance; and

(b) all other income receivable and actually received after the effective Date, including premiums, return premiums salvages, claim refunds or other moneys which may be applied in reducing the amount of any liability comprised in the Syndicate 1992 and Prior Business of that Syndicate or Closed Year Syndicate.

In the performance of the Reinsurance Obligation in respect of any Syndicate or Closed Year Syndicate [Equitas] shall have the obligation and responsibility for the collection of the amounts referred to in paragraphs (a) and (b) above and shall bear any risk of failure to collect such amounts. [Equitas] shall pay, or procure payment of, amounts agreed or lawfully due and payable in respect of any Claim or otherwise due under clause 3.2 on behalf of the relevant Syndicate (or Closed Year Syndicates in the circumstances set out in clause 3.3).

*Id.* at pp. 5–6.

In exchange for the reinsurance agreement, the parties agreed in conjunction with the "run-off of the reinsured accounts" that Equitas:

shall be entitled to assume, and undertakes and agrees to assume responsibility for, and the Names and Closed Year Names irrevocably appoint [Equitas] to perform, the Run-off in accordance with the provisions of this Part II of this Agreement ....

### Powers of [Equitas]

9.2 ... [Equitas] will assume exclusive and irrevocable responsibility for the Run-off of the Syndicate 1992 and Prior Business of each Syndicate and each Closed Year Syndicate. [Equitas] shall be entitled and obliged from the time and date on which the last condition in clause 2.1 is satisfied to conduct the Run-off of the Syndicate 1992 and Prior Business of each Syndicate and each Closed Year Syndicate as agent of the Names and Closed Year Names in its absolute discretion without prejudice to the power of the Substitute Agent under [certain trusts] or otherwise in relation to the discharge of any consideration due under clause 3.1, and, without prejudice to the generality of the foregoing, [Equitas] shall be entitled, in accordance with, and subject to, all applicable laws, to exercise the following powers together with all such powers as may be necessary or expedient in relation thereto:

(a) power to adjust, handle, agree, settle, pay compromise or repudiate any Claim, return premium, reinsur-

ance premium or any other insurance or reinsurance liability on behalf of the Syndicate or Closed Year Syndicate;

\* \* \* \* \* \*

(c) power to agree to any variation or extension of existing contracts of insurance or reinsurance entered into by or on behalf of the Syndicate or Closed Year Syndicate ...;

(d) power to commence, conduct, pursue, prosecute, settle, appeal or compromise any Legal Proceedings on behalf of the Syndicate or Closed Year Syndicate or any Name or to defend any such proceedings taken out against the Syndicate or Closed Year Syndicate or any Name or Closed Year Name in which any outcome will by virtue of this Agreement be for the account of [Equitas] including the provision of any security in respect of any such proceedings;

\* \* \* \* \* \*

(i) power to enter into any arrangements which [Equitas] considers will or may avoid any liability in respect of a Claim;

\* \* \* \* \* \*

(k) power to commute or enter into an agreement for the discharge of any liability or prospective liability under any insurance or reinsurance policy, or for the recovery of any asset;

\* \* \* \* \* \*

(p) power to instruct lawyers, claim adjusters or any other experts or consultants in any matter; ....

*Id.* at pp. 21–23. The reinsurance contract further provides that Equitas has "irrevocable and exclusive power to manage each run-off in accordance with the provisions of this Agreement" and that in the process Equitas is not bound to comply with any instructions or requests of any Name or Closed Year Names. Equitas' liability under the agreement is to "keep each Name

and each Closed Year Name fully indemnified and held harmless at all times and against all costs, losses, claims, damages or expenses including extra-contractual obligations or punitive or penal damages arising out of or relating to any acts or omissions ... of [Equitas] ... in relation to the Syndicate 1992 and prior business of any Syndicate or Closed Year Syndicate of which that Name or Closed Year Name was a member ...." *Id.* at p. 25–¶ 10.2.

Plaintiffs rely on a number of the provisions set forth above in support of their argument that the reinsurance contract constitutes an assignment and delegation which creates in plaintiffs a right to pursue a direct cause of action against Equitas. Plaintiffs also note that Equitas selectively has participated in various aspects of discovery initiated by plaintiffs "on its own terms." Plaintiffs complain that Equitas' sporadic involvement with the litigation deprives this court of the ability to exercise any directed authority over the most active entity with regard to the claims at issue and the entity most affected by the outcome of the litigation. Based on these premises plaintiffs contend that Equitas should be formally made a party to the action.[4]

Plaintiffs invoke Fed.R.Civ.P. 15(a) and place much emphasis on its liberal application in furtherance of the ends of justice. They argue that permitting the joinder of Equitas will not work a prejudice or injustice upon any party and contend that

[a]s demonstrated throughout [their] brief the London Defendants themselves have brought Equitas before this court on numerous occasions. Further, it is Equitas that is ultimately liable for any judgment against the Lloyd's Syndicates who are parties to this action. Moreover, the London Defendants cannot contend that the presence of Equitas in this action will have any affect on the method by which they have handled this

---

**4.** Plaintiffs do not allege that should they ultimately establish that coverage is due and owing under the policies, they will legally be unable to collect any such judgment from the defendants.

litigation in that Equitas is in the exclusive control of this action. In fact, if this court permits the amendments sought hereby, the only effect will be to formally recognize what has been true since the formation of Equitas: that Equitas has sole responsibility for the handling of plaintiffs' claims and the direction of this litigation.

Plaintiffs' Brief in Support at p. 21.

The London Defendants' argue that the reinsurance contract contains numerous provisions which demonstrate that, despite the oversight and control given to Equitas with regard to settling or managing pre–1993 policy liability, it was the express intention of the parties to create under English law a contract of reinsurance and not to effect a change of liability on the insured policies. They note that the contract itself is denominated as a "reinsurance and run-off contract" and that the Supreme Court of Pennsylvania long ago recognized that the nomenclature used may reflect the intent of the parties. *See Appeal of Goodrich*, 109 Pa. 523, 2 A. 209, 212 (1885) ("The words 'reinsurer' and 'reinsurance' would therefore seem, in the first instance at least, to characterize the contract and to point out the object and purpose of the parties."). They also note that recital (J) provides:

> This Agreement is to take effect as a contract of reinsurance and shall have no effect on the liability of any Name or Closed Year Name under any original contract of insurance entered into by such Name or Closed Year Name. The liability of the relevant Names or Closed Year Names under contracts of insurance underwritten by them shall remain several and not joined.

*See* Reinsurance Contract at p. 3 ¶ (J). They further note that Equitas' obligation is to "reinsure and indemnify each and every Syndicate and each Closed Year Syndicate" in accordance with the agreement's terms and conditions. *Id.* at ¶ 3.1. The Names are required to pay a reinsurance premium as a condition of Equitas covering their liabilities. *Id.* at ¶ 5.1. And, the Names may be entitled to receive a return of a portion of their reinsurance premium pursuant to a specified formula. *Id.* at ¶ 8 and Schedule 5. Against this backdrop they point out that the two courts which have issued opinions addressing the nature of the contract have concluded that it is one of reinsurance. *See Long Island Lighting Co., supra*, at 3 (opining in rejecting the plaintiff's argument that Equitas was a real party in interest that "[t]he alleged relationship between Equitas and the Names is one of reinsurance and indemnity, which does not change the Names' liability on the policies at issue."); *First State Insurance Co., et al. v. Minnesota Mining & Manufacturing Co.*, No. C3–94–12780 (Minn.D.C., County of Ramsey, May 1, 1997) ("*3M* ") at p. 4, *reprinted at* Exhibit D to the London Defendants' Appendix in support (by rejecting the argument that Equitas has become a new insurer of the underlying policies the court was "persuaded that the parties ... intended to create a contract of reinsurance and that they plainly, clearly and repeatedly so stated.").

The London Defendants also point out that despite their attempts to characterize the transaction as an assignment and delegation, plaintiffs essentially are arguing that they are third-party beneficiaries, and note that § 3.7 of the reinsurance contract provides:

> It is hereby acknowledged by each of the parties to this Agreement that, other than pursuant to clause 3.11, this Agreement is not intended to and does not create any obligations to or confer any rights upon its Insurance Creditors [policyholders] or any other persons not parties to this Agreement. It is hereby further acknowledged by each of the parties to this Agreement that this Agreement is not intended to and does not create any third-party beneficiary status in, or confer third-party beneficiary rights upon, insurance creditors or any other persons with respect to this

Agreement but without prejudice to the terms of the declaration of trust.

Reinsurance Contract at ¶ 3.7.[5]

Defendants also point out that the reinsurance contract provides in pertinent part:

All rights and obligations, of whatever sort, of any person, arising out of, or in any way related to or connected with, this Agreement and all the terms and provisions thereof and all questions of construction, validity and performance hereunder and all appointments and authorities granted pursuant hereto shall be governed by and construed in accordance with the laws of England.

Reinsurance Contract at ¶ 25.1. It further provides that any dispute to "enforce the rights and/or obligations of any person arising out of or in any way related to or connected with this Agreement" must be brought before the high court of England and Wales, which shall have "exclusive jurisdiction" to resolve any such dispute. *Id.* The London Defendants note that English law has a strict privity requirement for the enforcement of contractual rights and does not recognize the concept of a third-party beneficiary.

■ Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." The decision to grant leave rests with the discretion of the district court. *Lewis v. Curtis,* 671 F.2d 779, 783 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). "Factors the trial court may appropriately consider in denying a motion to amend include undue delay, undue prejudice to the opposing party, and futility of amendment." *Aver-*

*bach v. Rival Mfg. Co.,* 879 F.2d 1196, 1203 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990) (*citing Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). In this context "futility" means that the proposed amendment fails to state a claim upon which relief can be granted. *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1434 (3d Cir.1997).

■ Rule 20(a) provides for the permissive joinder of parties if "there is asserted against them ... any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in that action." Like Rule 15, the prerequisite to invoking Rule 20 is the ability to demonstrate some right of relief against the party to be joined. *See Intercon Research Assocs., Ltd. v. Dresser Industries,* 696 F.2d 53, 58 (7th Cir.1982) ("Rule 20(a) was designed to allow a plaintiff to join only those parties against whom the plaintiff has a legitimate claim.").

■ It is well established in Pennsylvania that in general a policyholder has no direct cause of action against a reinsurer. *Reid v. Ruffin,* 503 Pa. 458, 469 A.2d 1030, 1033 (1983). An exception is recognized, however, if the reinsurance contract makes the original insured a third-party beneficiary or where the reinsurer is a successor which has assumed the original insurer's liability. *Id.* at 1032.

■ Plaintiffs' contention that the reinsurance agreement should be construed

---

5. The Pennsylvania Supreme Court has indicated that a person should be recognized as a third-party beneficiary where "the recognition of the beneficiary's rights [is] ... 'appropriate to effectuate the intention of the parties,' and ... 'the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'" *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744, 751 (1983); *Scarpitti v. Weborg,* 530 Pa. 366, 609 A.2d 147, 150–151 (1992) (*citing Bryan v. Acorn Hotel, Inc.,* 931 F.Supp. 394, 396–97 (E.D.Pa.1996).) Under the reinsurance con-

tract the Names remain liable to the policyholders to the extent that Equitas ultimately fails. *See* Plaintiffs Brief in Support at p. 13 n. 12 (*citing* Deposition of Barry Seymour (the Equitas official handling plaintiffs' claim): "there is no guarantee there will be a true finality ... the Names can still be liable in the event that finality does not occur."). Thus, it is clear that Equitas has only insured the Names' contractual obligations and that the Names' original liability on the policies is broader: "down to their last cuff links."

as an assignment and delegation agreement wherein Equitas legally has assumed a direct duty to plaintiffs is unavailing. In the insurance context an assumption agreement "shifts the risks from the original insurer to a second insurer and the second insurer assumes direct liability to the insured." *3M, supra,* at 6. In contrast, the Pennsylvania Supreme Court long ago defined "reinsurance" as "insurance effected by one underwriter with another, the latter wholly or partially indemnifying the former against the risks which he has assumed ...." *Appeal of Goodrich,* 2 A. at 211. The relationship involves "no privity between the original insured and the reinsurer; the latter is in no respect liable to the former as a surety or otherwise; the contract of insurance and of reinsurance being totally distinct and disconnected." *Id.* The Pennsylvania Superior Court has likewise explained that reinsurance is the "undertaking whereby one insurer agrees to protect another insurer, known as the reinsured, either wholly or partly from the risk which it has undertaken, both policies being in effect at the same time, and the original insured having no interest in the reinsurance.' " *Eastern Engineering & Elevator Co. v. American Re–Insurance Co.,* 309 Pa.Super. 578, 455 A.2d 1235, 1236 (1983) (*quoting* 13A Appleman, *Insurance Law & Practice,* § 7681, at 484–85 (1976)).

■ Plaintiffs make much of the fact that Equitas is involved in handling plaintiffs' claims and may ultimately pay any judgment which plaintiffs obtain against the London Defendants. It was long ago recognized, however, that the mere fact that a reinsurer has the authority to adjust losses or to pay a policyholder directly does not provide an underlying policyholder with a direct cause of action against a reinsurer. *See Appeal of Goodrich,* 2 A. at 213 (reinsurer's contractual rights to control original insured's "registers, books, reports, and other papers in any way relating to the policies" and to "assume the care and expense of the adjustment of all losses which may occur under the policies" under insurance contract covering *all* of original insurer's outstanding risks did not give rise to basis for a direct suit by policyholders where reinsurance policy did not expressly (1) provide for the assumption of all underlying policies and (2) obligate the reinsurer to pay the policyholders directly); *Allendale Mutual Ins. Co. v. Crist,* 731 F.Supp. 928, 933 (W.D.Mo.1989) (distinguishing cases which expressly assigned proceeds of reinsurance to underlying policyholders and opining that "[s]tanding alone, what a reinsurer does about paying claims has no bearing on whether the reinsurer is directly liable to the original insured."). Under plaintiffs' theory any time a reinsurer is given authority to oversee claims which may fall within the scope of its policy, that authority would necessarily transform the reinsurance contract into one of direct assignment. Plaintiffs cite no persuasive authority for such a proposition.

■ Moreover, plaintiffs' attempt to avoid the express language of the contract upon which it seeks to establish an assignment and delegation is unavailing. The language employed in an insurance contract is the primary means for ascertaining the parties' intent. *Bateman v. Motorists Mutual Ins. Co.,* 527 Pa. 241, 590 A.2d 281, 283 (1991). Unambiguous language in the contract is to be given its plain and ordinary meaning. *Id.; Niagara Fire Ins. v. Pepicelli, et al.,* 821 F.2d 216, 220 (3d Cir.1987). An interpretation contrary to an unambiguous, expressed meaning of an insurance policy is as a matter of law unreasonable. *See, e.g., O'Brien Energy v. American Employers',* 427 Pa.Super. 456, 629 A.2d 957 (1993) (a court cannot convolute the plain meaning of a writing merely to find an ambiguity). The contract under consideration is "a reinsurance and run-off contract." It marshals certain of the assets of the Names and syndicates in conjunction with various premiums, trusts and reinsurance policies and transfers them to a central managing entity. The contract repeatedly refers to "reinsurance" and "reinsurance obligations." It

defines itself as a "reinsurance by [Equitas] of all liabilities under contracts of insurance underwritten at Lloyd's and allocated to the 1992 Year of Accounts or any prior year of account ..." [and] provides that Equitas' obligation thereunder is to "reinsure and indemnify each and every Syndicate and every Closed Year Syndicate ...." It further expressly provides that no rights or obligations inure to anyone who is not a party to the agreement and expressly states that it does not create third-party beneficiary rights in the underlying insureds. To assume that this contract is an assignment and delegation as advocated by plaintiffs "would require the court to ignore the parties' express language in favor of an assumed secret intent. The law does not permit such a conclusion." *3M*, at p. 6.

Plaintiffs' argument that the court should disregard the plain language of the reinsurance contract and permit a direct cause of action against Equitas also fails to acknowledge that even the authority upon which plaintiffs rely is conditioned on the proposition that the contract or agreement under consideration must unequivocally demonstrate that the parties intended the assignment to transfer both the rights and duties under the contract. The case law plaintiffs cite in support primarily concerns an unqualified assignment and expressed assumption of the underlying obligation. Plaintiffs also rely upon the Restatement (Second) of Contracts, § 328, which provides:

(1) Unless the language or the circumstances indicate to the contrary, as in an assignment for security, an assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract.

(2) Unless the language or the circumstances indicate to the contrary, the acceptance by an assignee of such an assignment operates as a promise to the assignor to perform the assignor's unperformed duties, and the obligor of the assigned rights is an intended beneficiary of the promise.

Restatement (Second) of Contracts, § 328. The language of the contract under consideration does indicate to the contrary.

The commentators consistently have recognized the contracting parties' ability to control the rights created in third parties. Professor Corbin has observed:

If two contracting parties expressly provide that some third party who would be benefited by performance shall have no legally enforceable right, the courts should effectuate the expressed intent by denying the third party any direct remedy.

A.L. Corbin, *Corbin on Contracts*, § 777 (1951); *see also* E.Alan Farnsworth, *Contracts*, § 10.3 (1990) ("If the parties have provided either that the third party has the right to enforce the agreement or that the third party does not have that right, the court will give effect to that provision."). And the courts consistently have given effect to the contracting parties' intent with regard to conferring such rights. *See Stuck v. Yoder*, 39 Northumberland Legal J. 152 (Pa.Ct.C.P.1967) (following contracting parties' expressed intent); *Gannon v. Baldt Anchor and Chain*, 459 F.Supp. 457 (E.D.Pa.), *aff'd*, 588 F.2d 820 (3d Cir.1978) (upholding contractual provision which precluded the plaintiff from being a third-party beneficiary); *Meyers Plumbing & Heating Supply Co. v. West End Federal Savings & Loan Assn.*, 345 Pa.Super. 559, 498 A.2d 966 (1985) (upholding express provision in contract which precluded third party from claiming intended beneficiary status); *Hrushka v. State*, 117 N.H. 1022, 381 A.2d 326, 327 (1977) (observing the general rule that "the rights of a third party are dependent upon the intent of the parties who executed the contract" and enforcing "no third-party beneficiary" provision in contract); *Allendale Mutual Ins. Co.*, 731 F.Supp. at 931 (upholding provision in reinsurance contract excluding third-party liability and

holding that insured has no right to sue a reinsurer under such circumstances).

 Finally, courts consistently recognize the contracting parties' ability to control the construction of a contract pursuant to a governing law provision. Pennsylvania follows this rule. *See Aluminum Company of America v. Essex Group, Inc.,* 499 F.Supp. 53, 59 (W.D.Pa.1980) (observing court's obligation to enforce parties' expressed choice of law provision); *Smith v. Commonwealth National Bank,* 384 Pa.Super. 65, 557 A.2d 775, 777 (1989) ("Choice of law provisions in contracts will generally be given effect."). Third parties seeking to establish rights likewise are subject to a choice of law provision. *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 203 (3d Cir.), *cert. denied,* 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983). The London Defendants sufficiently have established that English law does not recognize the concept of third-party beneficiaries and permits only parties in privity to sue when an asserted right is based upon a contract.

The contract upon which the plaintiffs seek to join Equitas is one which is distinct from the insurance policies at issue. The reinsurance contract is a separate transaction and occurrence upon which plaintiffs seek to create independent rights against an entity created in 1996. The reinsurance contract expressly provides that Equitas has not assumed the liabilities of the Names in the underlying policies of insurance and that the Names through the Syndicates remain severally liable on the insured policies. The reinsurance contract further provides that it was not the intent of the parties to create an intended benefit to the policyholders in contractual privity with the Names and Syndicates. Instead, it is readily apparent that the contracting parties intended to stabilize the London insurance market and permit the Names to close various policy years. Under the circumstances, the contracting parties agreed to transfer assets and reinsurance to a central administrator in exchange for that administrator's management of and indemnification for contingent liability. In

the end analysis the agreement is one of reinsurance and plaintiffs have no contractual right to sue Equitas directly. Accordingly, the plaintiffs' motion to amend will be denied.

An appropriate order will follow.

### ORDER OF COURT

AND NOW, this 30th day of September, 1998, for the reasons set forth in the opinion filed this day, IT IS ORDERED that plaintiffs' motion to amend its complaint to add Equitas as a party (Document No. 276) be, and the same hereby is, denied.