Joel S. ARIO, Insurance Commissioner of the Commonwealth of Pennsylvania, as Statutory Liquidator of Reliance Insurance Company, Plaintiff

v.

RELIANCE INSURANCE COMPANY, Defendant.

Commonwealth Court of Pennsylvania.

Argued June 11, 2009.

Deborah F. Cohen, Philadelphia, for plaintiff.

Daryn E. Rush, Philadelphia, for objector, Baptist Health South Florida, Inc.

BEFORE: SIMPSON, Judge, and LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

Before the Court are motions for summary judgment filed by Palm Springs General Hospital and Baptist Health South

Florida, Inc., (collectively, Hospitals).[1] Hospitals assert that they are entitled to have their medical malpractice claims paid by American Healthcare Indemnity Company (AHIC), which reinsured the policies issued to them by an affiliate of Reliance Insurance Company (In Liquidation). Hospitals claim that AHIC functioned as their malpractice insurer and, accordingly, request this Court to authorize AHIC's payment of their claims. In support, Hospitals assert that their request satisfies the standards established in *Koken v. Legion Insurance Company*, 831 A.2d 1196 (Pa. Cmwlth.2003) (single judge decision), *aff'd sub nom. Koken v. Villanova Insurance Company*, 583 Pa. 400, 878 A.2d 51 (2005).[2]

## Background

In the 1960s, Sullivan, Kelly & Associates, Inc., a California-based broker, developed a program of medical malpractice and general liability insurance for its hospital clients. As manager of the program, Sullivan Kelly located the insurers to write the medical malpractice coverage. It placed the primary layer with Farmers Insurance Group and the excess coverage with Lloyd's of London. In addition, Sullivan Kelly did the underwriting and pricing of the primary and excess policies; placed the reinsurance for the primary and excess insurers; and chose the company that handled the malpractice claims brought against the hospitals participating in the program.

In 1995, Sullivan Kelly began discussions with Southern California Physician's Insurance Exchange Holdings, Inc. (SCPIE) to have a SCPIE carrier replace Farmers on the primary layer of coverage.[3] Palm Springs General Hospital's Motion for Summary Judgment (Palm Springs), Exhibit 5. SCPIE agreed to establish a new company, American Healthcare Insurance Company (AHIC) to write the Sullivan Kelly hospital business. Because of the time needed to get AHIC licensed in all the states where Sullivan Kelly had introduced the program, it was decided to find an insurer that had the requisite insurance company licenses or authorizations to front for AHIC while it underwent the licensing process.[4] It was

1. This matter is before the Court on remand from our Supreme Court.

2. The Insurance Commissioner's appeal of the Commonwealth Court's order in *Legion* was consolidated with her appeal of the Commonwealth Court's order in *Koken v. Villanova Insurance Company*, (No. 182 M.D. 2002, filed June 26, 2003). The Supreme Court issued one order in the consolidated appeal under the caption *Koken v. Villanova Insurance Company*, 583 Pa. 400, 878 A.2d 51 (2005). The Supreme Court's *per curiam* order read:

> AND NOW, this 19th day of July, 2005, the order of the Commonwealth Court is hereby AFFIRMED, on the basis of the Commonwealth Court opinion, *Koken v. Legion Ins. Co.*, 831 A.2d 1196 (Pa.Cmwlth.2003). *Id.* at 404, 878 A.2d at 53. A *per curiam* affirmance on the basis of a lower court opinion means that the Supreme Court agrees with the lower court's rationale employed in reaching its final disposition. *Commonwealth*

*v. Tilghman*, 543 Pa. 578, 589, 673 A.2d 898, 904 (1996). Otherwise, a *per curiam* affirmance has no significance except as law of the case.

3. SCPIE Holdings, Inc. is a holding company, whose stock is publicly traded, that "through its insurance subsidiaries, [provides] medical malpractice and related liability insurance products to ... [those] engaged in the healthcare industry." Liquidator's Memorandum of Law in Opposition to Summary Judgment, Exhibit E at 1.

4. Many states, such as Pennsylvania, require physicians and hospitals to purchase medical professional liability insurance. *See, e.g.,* Section 711 of the Act of March 20, 2002, P.L. 154, 40 P.S. § 1303.711(a). It states:

> A health care provider providing health care services in this Commonwealth shall:
> (1) purchase medical professional liability insurance from an insurer which is li-

contemplated that once AHIC became licensed in a particular state, it would replace the fronting company in that state.

Reliance Insurance Company of Illinois, an affiliate of Reliance Insurance Company, was chosen to be the fronting company for SCPIE.[5]  In accordance with the fronting arrangement, Reliance Illinois issued the policies providing the primary layer of coverage for claims under $500,000. These policies, created by SCPIE, were assigned Reliance and SCPIE policy identification numbers.  AHIC accepted "100% of [Reliance's] 'ultimate net loss' [on] each and every loss, each and every subject policy" in accordance with an "Automatic Facultative Quota Share Reinsurance Agreement" (Reinsurance Agreement). Palm Springs, Exhibit 17 at 5.  The Reinsurance Agreement defines ultimate net loss at "100% of the amounts paid or payable in defense and/or settlement of loss or liability under [the Reliance] policies." *Id.* Reliance paid AHIC a "Reinsurance Premium" of 100% of the "Gross Net Written Premium actually received by [Reliance] on Business Covered." *Id.* at 6.  AHIC allowed Reliance "five percent (5%) of the Reinsurance Premium payable under this Agreement...." *Id.*

The Reinsurance Agreement contains provisions that are standard for reinsurance contracts.  Of significance to this case are two clauses highlighted by the Liquidator in support of his argument that Hospitals should be denied direct access.

The first clause highlighted by the Liquidator is a clause (Privity Clause) that prevents either policyholders or claimants from sidestepping the ceding company and presenting their claims directly to the reinsurer.  This Privity Clause states:

> Except as expressly provided for in the Article entitled *Insolvency*, the provisions of this Agreement are intended solely for the benefit of [Reliance] and Reinsurer.  Nothing in the Agreement shall in any manner create or be construed to create any obligations to or establish any rights against any party to this Agreement in favor of any other persons not party to this Agreement.

Palm Springs, Exhibit 17, art. XV.  Notably, this clause ceased to be effective after insolvency.

The second clause highlighted by the Liquidator is the Insolvency Clause.  It states, in pertinent part, as follows:

> In the event of the insolvency of one (or more) of the reinsured companies, *this reinsurance shall be payable immediately upon demand directly to the insolvent Company, or to its liquidator,* receiver, conservator or statutory successor on the basis of the liability of that Company without diminution because of the insolvency of that Company or because the liquidator, receiver, conservator or statutory successor of that

censed or approved by the department; or
(2) provide self-insurance.
A surplus lines insurer is an example of an "approved" insurer.

5.  Reliance of Illinois was a Reliance affiliate that did business as a surplus lines insurer; it was merged into Reliance prior to the latter's insolvency.  A surplus lines insurer is not licensed by the state in which it issues policies but is authorized to do business in that state. Generally, a surplus lines insurer offers coverage to commercial risks or risks that are difficult to place.  The policies of a surplus lines insurer are not eligible for any coverage from state guaranty associations in the event of the insurer's insolvency.  *See, e.g.,* Act of May 17, 1921, P.L. 682, Section 1609 added by the Act of December 18, 1992, P.L. 1519, *as amended,* 40 P.S. 991.1609(a)(1)(ii)(B) ("in the event of the insolvency of the insurer, losses will not be paid by the Pennsylvania Property and Casualty Insurance Guaranty Association.")

Company has failed to pay all or a portion of any claim.

\* \* \*

The reinsurance shall be payable by the Reinsurer to that Company or to its liquidator, receiver, conservator or statutory successor, except as provided by applicable Insurance Law, or except (a) where the Agreement specifically provides another payee of such reinsurance in the event of the insolvency of that Company, and (b) where the Reinsurer with the consent of the direct insured or insureds have assumed such policy obligations of that Company as direct obligations of the Reinsurer to the payees under such policies and in substitution for the obligations of that Company to such payees.

*Id.*, art. XVIII (emphasis added).

In accordance with a "Program Manager's Agreement," SCPIE Management Services, Inc., an affiliate of AHIC, underwrote the Reliance fronting policies issued to Hospitals, using the underwriting guidelines developed by Southern California Physician Insurance Exchange, another SCPIE insurance company. Palm Springs, Exhibit 18, Exh. A. SCPIE Management also priced the policies issued to Hospitals and collected the premium from them. SCPIE Management wired the premium it collected to Reliance, which, in turn, remitted the premium, less its 5% ceding commission, to SCPIE Management. Reliance demanded that the premium flow through Reliance in this manner because of certain "tax and accounting rules." Palm Springs, Exhibit 35 at 1. SCPIE Management provided monthly premium reports to Reliance. The costs of the services provided by SCPIE Management were paid by AHIC. Palm Springs, Exhibit 18, art. V.

Pursuant to a separate "Claims Services Agreement," SCPIE Management investigated, defended and adjusted the malpractice claims covered by the program. Palm Springs, Exhibit 19. It gave SCPIE Management total settlement authority, *i.e.*, $500,000 per claimant and per occurrence. *Id.* at 19. The Claim Services Agreement allowed Reliance "the right to assume the control and handling of any Claim at any time." *Id.* at 4. However, Reliance did not exercise this right. SCPIE Management agreed to provide the services until "each claim shall have been paid. . . ." *Id.* at 4. The services included "all payments with respect to Claims and to pay all Allocated Loss Expenses . . . from funds provided in accordance with the procedures set forth in Exhibit D." *Id.* at 5. Exhibit D provided that "SCPIE Management would establish a regular bank checking account . . . [called] the Disbursement Account . . . [to] be used solely to make payments of Claims or to pay Allocated Loss Expenses or to receive recoveries in accordance with the terms of this Exhibit and the Agreement." *Id.* at 26. In consideration for SCPIE Management's "Basic Services for all Claims," including the funding of the Disbursement Account, Reliance agreed to pay SCPIE Management "fees and charges set forth in Exhibit C." *Id.* at 5. The fees and charges in Exhibit C are stated to be "None." *Id.* at 25.

The 5% fronting fee, or ceding commission, paid to Reliance under the Reinsurance Agreement, was lower than the 10% suggested by the Reliance corporate guidelines for fronting arrangements. However, Reliance deemed the 5% fee an "adequate front fee considering Reliance's limited administrative involvement." Palm Springs, Exhibit 36, August 1, 1997, internal Reliance memorandum.

In 1996, when Farmers was dropped from the program, Sullivan Kelly offered "the SCPIE Program" to its hospital clients as Farmers' replacement. In its

marketing materials, Sullivan Kelly identified the malpractice program as the "SCPIE Program," Palm Springs, Exhibit 30, and explained, in a form letter to clients, that *"SCPIE policy coverage* will be much like the Farmers Insurance Group policy." Palm Springs, Exhibit 28 (emphasis added). These marketing materials trumpeted SCPIE's qualifications to provide claims management and risk management services to participating hospitals. These materials were silent on Reliance's qualifications in any regard; indeed, they did not make any reference to Reliance.

In 1996, Reliance began fronting for SCPIE, thereby replacing Farmers on the policies issued to Hospitals. At that time, Palm Springs had been involved with the Sullivan Kelly program for three years and Baptist Health for four years. On October 1, 1998, after SCPIE was licensed, the fronting arrangement with Reliance ended. Thereafter, AHIC issued the policies directly to Hospitals.

### The Reliance Liquidation

On October 3, 2001, Reliance was placed into liquidation, a proceeding governed by Article V of The Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789, added by Section 2 of the Act of December 14, 1977, P.L. 280, *as amended,* 40 P.S. §§ 221.1–221.63 (Article V). As a result of this liquidation order, SCPIE Management ceased paying on claims presented by Hospitals because the Liquidator asserted a right to these payments under the Reinsurance Agreement. Accordingly, since 2001, Hospitals have been funding the claims arising from the 1996–1998 policy periods; those claims are not covered by state guaranty funds.

In connection with the Reliance liquidation, this Court approved the Liquidator's proposed guidelines for evaluating a Reliance policyholder's request for direct access to reinsurance.[6] The Reliance Guidelines provide that a policyholder seeking direct access to reinsurance proceeds must present a cut-through endorsement. In pertinent part, the Reliance Guidelines state:

3.  Where a binding written contract document creating the reinsurance relationship between Reliance and a reinsurer contains a provision relating to the direct payment of the claims of an insured by the reinsurer, and the reinsurer or insured desires that such direct payment be made by the reinsurer, the reinsurer or insured must first submit a written request to the Liquidator seeking approval of direct payment by the reinsurer.

4.  In reviewing the written request [for approval of direct payment by the reinsurer], the Liquidator, or her designee, shall determine whether the following requirements are satisfied before approving the request:

    a.  *The reinsurance contract must specifically provide for payment to an individual named insured and that insured must be identified with particularity either by name or policy number in the reinsurance contract;*

    b.  *The reinsurance contract must provide for a direct coverage obligation by the reinsurer to the insured* and the payment must

---

**6.** Hospitals contend that the Court approved these guidelines without affording them an opportunity to object. Notice went to AHIC and SCPIE, but not to Hospitals. Because of this lack of notice, Hospitals contend the guidelines cannot be applied to them. It matters not because the guidelines were just that, guidelines. They were not adopted as binding norms from which no exception was possible.

be made in satisfaction of that coverage obligation. The term "direct coverage" in § 221.34 refers to the creation of rights in the insured to look to the reinsurer directly to satisfy coverage obligations in place of and in substitution for any obligations of Reliance to the insured and on such terms as are set forth in the policy of insurance between Reliance and the insured.

Order of April 26, 2002, Exhibit A (emphasis added). Following the Liquidator's refusal to permit Hospitals' direct access to the AHIC reinsurance, the Hospitals filed objections.

This Court assigned Hospitals' objections to a Referee, who used the documentary evidence submitted by the parties to establish the record. Hospitals objected, citing a need for more discovery. Based on the legal arguments of the Liquidator and of Hospitals, the Referee recommended that (1) Hospitals' request for discovery be denied and (2) Hospitals' objections be denied. This Court accepted the Referee's findings of fact, but it did not adopt his recommendation. Instead, the Court granted Hospitals' objections, thereby allowing them to present their claims to AHIC for payment.

At the time Reliance was placed into liquidation in 2001, the management of Reliance and SCPIE had been negotiating a novation to have a SCPIE insurance company replace Reliance retroactively on the 1996–1998 fronting policies. Negotiations continued after Reliance was placed into liquidation, but the Liquidator refused to agree to a novation. However, this Court ruled that the parties, by their actions, had "caused a novation of the reinsurance contract," thereby authorizing Hospitals to present their claims to AHIC for payment. *Koken v. Reliance Insurance Company*, 846 A.2d 167, 172 (Pa. Cmwlth.2004). On appeal, our Supreme Court, in a *per curiam* order, vacated and remanded "for discovery relating to the issue of whether Palm Springs General Hospital and Baptist Health South Florida Hospital are entitled to direct access." *Koken v. Reliance Insurance Company*, 586 Pa. 100, 891 A.2d 704 (2005). Following remand, the parties engaged in discovery. Hospitals have filed the present motions for summary judgment.[7]

## Motions for Summary Judgment

Hospitals contend that they are entitled to direct access to the AHIC reinsurance as an exception to the general rule that reinsurance proceeds are assets of the estate of the insolvent insurer. This general rule, which is incorporated into the Reliance Guidelines, "makes little sense" where the reinsurer, here AHIC, effectively functioned as Hospitals' insurer under the fronting arrangement. *Legion*, 831 A.2d at 1234. Hospitals contend that they fall into the exception to the general rule under the principles established in *Legion*,

7. The standards which govern summary judgment are well settled. When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. *Fine v. Checcio*, 582 Pa. 253, 265, 870 A.2d 850, 857 (2005). A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Id.* The court may grant summary judgment where the right to judgment is clear and free from doubt. *Id.*

831 A.2d 1196.[8]

In response, the Liquidator contends that (1) Hospitals' claim for direct access to reinsurance is barred by Section 534 of Article V, 40 P.S. § 221.34, which the Liquidator believes to require a cut-through endorsement and (2) Hospitals cannot establish that they fit within the *Legion* exception because they cannot satisfy each and every principle established in *Legion.*

### Direct Access to Reinsurance

As has been noted, the proceeds of a reinsurance contract are generally considered to be assets of the estate. *Legion,* 831 A.2d at 1234. However, there are exceptions to the general rule. Section 534 of Article V provides, in relevant part, as follows:

> The amount recoverable by the liquidator from reinsurers shall not be reduced as a result of delinquency proceedings, regardless of any provision in the reinsurance contract or other agreement. Payment made directly to an insured or other creditor shall not diminish the reinsurer's obligation to the insurer's estate *except when the reinsurance contract provided for direct coverage of an individual named insured* and the payment was made in discharge of that obligation.

40 P.S. § 221.34 (emphasis added). Where a policyholder is granted direct access to the insolvent insurer's reinsurance, the reinsurer reduces its obligation to pay reinsurance to the statutory liquidator by the amount paid to the policyholder.

In *Legion,* a decision of this Court rendered in its original jurisdiction and affirmed in a *per curiam* order by our Supreme Court in 2005, this Court granted four policyholders (Policyholder Intervenors) direct access to reinsurance. Only one policyholder, American Airlines, produced a cut-through endorsement of the type that arguably complied with the Reliance Guidelines. *Legion,* 831 A.2d 1196.[9] Nevertheless, the Court granted direct access to all four Policyholder Intervenors because they had demonstrated that they, not Legion, were the intended beneficiaries of the reinsurance agreements in question. Legion functioned only as a pass-through for premium and claim payments and not as a true underwriter of insurance risk.

In reaching this conclusion, the Court explained the rationale for the general rule that reinsurance recoveries are assets of the insolvent insurer's estate and why that general rule did not apply to Policyholder

---

**8.** Hospitals note that in the Reliance liquidation, this Court has permitted several policyholders direct access to reinsurance "[w]here there is a fronting reinsurance arrangement [and] equity suggests that direct access be permitted." *See, e.g., Koken v. Reliance Insurance Company (BAIG),* (Pa.Cmwlth. 269 M.D. 2001, filed January 4, 2008), slip op. at 8.

**9.** With respect to the Policyholder Intervenors in *Legion,* the Court observed:

> The Policyholder Intervenors all assert third-party beneficiary rights but on different factual grounds. The rights of Pulte, Rural/Metro, and PPG stem from facultative reinsurance agreements specific to their individual risks; they were issued facultative certificates. American [Airlines] claims rights under a reinsurance agreement that is not strictly facultative, i.e., a facultative obligatory treaty. On the other hand, the contract, or wording, between Legion and Syndicate 271 [the reinsurer on American's risk] contains language that [the Rehabilitator acknowledged] expresses American's right to cut-through Legion to collect reinsurance directly from Syndicate 271. In spite of the differences in their circumstances, all the Policyholder Intervenors can demonstrate third-party beneficiary status under the two-part *Guy* test.

> 831 A.2d at 1237.

Intervenors. It stated, in relevant part, as follows:

> The two main reasons cited for purchasing reinsurance are capacity and stability. By arranging for reinsurance a primary carrier can relieve itself from the full burden of a large loss. By accepting a share of the loss, *reinsurance has the effect of adding to the financial capacity of the primary insurer and stabilizing the primary carrier's financial results*.... Where the direct insurer seeks safety in reinsurance in the above-described manner, *generally the policyholder has no knowledge of either the existence or application of reinsurance proceeds to his claims*....
>
> The usual occasion for reinsurance has no application to Legion [the insolvent insurer]. The Policyholder Intervenors, not Legion, placed the reinsurance; Legion neither adjusted nor funded claims; and Legion did not seek to expand its underwriting capacity through reinsurance. Indeed, it sought to avoid any underwriting because its business plan called for generation of fees not underwriting profits.

*Legion*, 831 A.2d at 1234 (citations omitted) (emphasis added). In *Legion*, in contrast to the usual "occasion for reinsurance," the Policyholder Intervenors did have knowledge of the existence of the reinsurers in the program. *Id.* Indeed, the decision of the Policyholder Intervenors to choose the insurance program developed by their brokers and consultants was based upon the expertise and financial strength of the reinsurers. It was Le-

gion's qualifications in these respects that were unknown, which made sense in light of its limited role as fronting company.

The Court also rejected the Rehabilitator's invitation to apply the Reliance Guidelines to the *Legion* Policyholder Intervenors. The Rehabilitator argued that Section 534 required a cut-through endorsement in order for a Policyholder Intervenor to obtain the benefit of the reinsurance that it, not Legion, had chosen to be responsible for claims. Specifically, the Court explained as follows:

> Section 534 of Article V does not require a cut-through endorsement in the form of holy writ; it does not even use the term "cut-through." Even if the statute had used those words, its meaning would be less than clear in light of the fact that there is more than one way to effect a cut-through.

*Id.* at 1241. Stated otherwise, the Court reasoned that the "traditional approach" of looking solely to the boilerplate provisions found in every reinsurance contract "holds little instructional value for a situation where the insolvent insurer acted only as a pass-through and not as a true insurer." *Id.* at 1236.

■ The *Legion* holding found its origins in *Reid v. Ruffin*, 503 Pa. 458, 461, 469 A.2d 1030, 1032 (1983), wherein the Supreme Court held that "the insured may bring a direct action against the reinsurer where the reinsurance contract may properly be determined to be a third party beneficiary contract." (citing *Appeal of Goodrich*, 109 Pa. 523, 2 A. 209, 211 (1885)).[10] The *Legion* decision also relied

---

**10.** The policyholder in *Reid* was not successful in establishing third-party beneficiary rights because of the reinsurer's limited involvement in the underlying insurance program. As the Court explained in *Legion:*

> In determining third-party beneficiary rights under a reinsurance contract, courts

look at the extent of the reinsurer's involvement in the underlying insurance program. In *Reid*, the Pennsylvania Supreme Court noted that unless certain factors are present, the general rule is that an insured does not enjoy a right of direct action against the reinsurer. In *Reid*, the requisite factors

upon *Guy v. Liederbach*, 501 Pa. 47, 61, 459 A.2d 744, 751 (1983), in which the Supreme Court adopted Section 302(1) of the Restatement (Second) of Contracts. Section 302(1) states that a person may assert and exercise third-party beneficiary rights to a contract where either (1) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary, or (2) the circumstances indicate that the promisee intended to give the beneficiary the benefit of the promised performance. In a subsequent decision, the Supreme Court further clarified:

> [A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, *unless, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties,* and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Scarpitti v. Weborg*, 530 Pa. 366, 372–373, 609 A.2d 147, 150 (1992) (citations omitted) (emphasis added). In sum, an intention to benefit a third party may be found in the language of the contract or that intention may be found in the "circumstances." *Id.*

In *Legion*, the Court explained that determining the merits of a policyholder claim for third-party beneficiary status is done on a case-by-case basis, reviewing the relationship among the reinsurer, the ceding insurer and the policyholder. *Legion*, 831 A.2d at 1236 (citing *Mellon v. Security Mutual Casualty Co.*, 5 Phila. Co. Rptr. 400 (1981)).[11] The Court found persuasive a decision of the New Jersey Superior Court that had reviewed the relationship of the reinsurer, insurer and policyholder, explaining as follows:

> In *Venetsanos [v. Zucker, Facher & Zucker*, 271 N.J.Super. 459, 638 A.2d 1333 (App.Div.1994) (discussing Reid)]*, the New Jersey Superior Court found the *Reid* factors to be present and held that the insured had a right to claim the reinsurance proceeds. It determined that where a reinsurer (1) underwrote the insurance policy in question, (2) undertook 100% of the risk from an insolvent "fronting" insurer, (3) retained final authority to negotiate and settle all claims on behalf of the "fronting" insurer, and (4) reimbursed the fronting insurer for all payments made under the policy, the policyholder was a third-party beneficiary to the reinsurance contract and could proceed directly against the reinsurer upon the primary insurer's insolvency ... The *Venetsanos* court distinguished a fronting arrangement from a "more orthodox reinsurance situation."

could not be found because the direct insurer retained most of the risk, with only 25% reinsured, and it controlled the settlement of claims.
*Legion*, 831 A.2d at 1237.

11. The *Mellon* court stated:
Rather, a determination of whether an original insured may sue a reinsurer directly must be made on a case-by-case basis, viewing the plain language of the agreement in light of the generally recognized functions and purposes of reinsurance. Pennsylvania courts have demonstrated a willingness to review the relationship between such parties on a case-by-case basis and evolve exceptions to the general rule where the agreement itself, *or the relationships among the reinsurer, the reinsured and the original insured, extend beyond the realm of traditional reinsurance* and evidence an intent to create third-party beneficiary status for the original insured.
*Mellon*, 5 Phila. Co. Rptr. at 407–408 (emphasis added).

*Legion,* 831 A.2d at 1237–1238 (citation omitted). Indeed, the factors identified by the *Venetsanos* court all tilted in favor of the Policyholder Intervenors.

> Here, as in *Venetsanos,* factors are present to support a finding that the Policyholder Intervenors were third-party beneficiaries of the reinsurance contracts between Legion and the appropriate reinsurer. Legion acted as a fronting company, and it bore no true underwriting risk. Legion did not underwrite the risk, but, rather, was content to allow the true risk bearer, the reinsurer, to conduct the necessary due diligence. Legion also did not participate in the claims handling process, or the funding of claims. In all cases, these were the responsibility of the reinsurers.

*Id.* at 1238.

■ In sum, *Legion* established that a cut-through endorsement is not the *sine qua non* for a policyholder claiming to be the third-party beneficiary of a reinsurance contract. Rather, a policyholder may establish its claim by showing that "circumstances" compel recognition of the policyholder's third-party beneficiary status, so that the intent of the parties will be effected. *Scarpitti,* 530 Pa. at 372–373, 609 A.2d at 150.

### Position of Hospitals

■ Hospitals argue that their situations cannot be distinguished from those of the successful Policyholder Intervenors in *Legion.* The *Legion* principles provide that a policyholder will be granted direct access under the "totality of circumstances" test, which involves an analysis of the following factors: (1) whether the ceding insurer acted solely as a fronting company; (2) whether the ceding insurer entered into the transaction to generate fees as opposed to premium revenue; (3) whether the reinsurer functioned as the direct insurer by funding and processing the claims; (4) whether the ceding insurer, or the policyholder, selected the reinsurer; and, (5) whether the equities favor direct access. Hospitals argue that all five of these factors favor the conclusion that they should be granted direct access to AHIC reinsurance.

### Position of Statutory Liquidator

The Statutory Liquidator does not agree that the Hospitals satisfy all five of the above-enumerated factors. Specifically, the Liquidator argues that Hospitals were not a moving force in the placement of the reinsurance with AHIC and that the equities do not favor them. Alternatively, they contend that the Court erred in finding that by their conduct the parties effected a novation. It follows, according to the Liquidator, that the Privity and Insolvency Clauses in the Reinsurance Agreements govern, and they direct AHIC to pay the Liquidator, not Hospitals. The Statutory Liquidator opposes entry of judgment in favor of Hospitals.[12]

### Standard Clauses in Reinsurance Agreement

Every reinsurance contract contains certain general, or standard, clauses. ROBERT W. STRAIN, REINSURANCE CONTRACT WORDING (3d ed. 1998) at 41. The Privity Clause and the Insolvency Clause of the Reinsurance Agreement, on which the Liquidator

---

12. The Liquidator asserts that summary judgment cannot be granted because the facts that bear on this issue are either undisputed, weigh in Reliance's favor or are "hotly contested." Liquidator's Memorandum of Law in Opposition to Summary Judgment at 2. However, the Liquidator has not identified these disputed material facts with any specificity.

relies, are examples of such standard clauses. Notably, standard clauses appear even where the reinsurance agreement contains an express cut-through provision, of the sort contemplated in the Reliance Guidelines, that allows the policyholder a direct action against the reinsurer for payment of claims.

In a reinsurance agreement, the reinsurer indemnifies the ceding insurer for claims it has actually paid. The mere existence of a ceding insurer's *liability* to pay a claim to or on behalf of the policyholder does not trigger a contractual obligation in the reinsurer. However, there is an exception to the indemnity nature of the reinsurer's contractual obligation for the situation where the ceding insurer becomes insolvent, and this exception is spelled out in the so-called Insolvency Clause. Under the Insolvency Clause, the liquidator of the insolvent insurer may demand payment from the reinsurer on the basis of the insolvent insurer's claim liability, as opposed to its actual payment on a claim.

The pivotal case establishing reinsurance as a contract of indemnity is *Fidelity & Deposit Co. of Maryland v. Pink*, 302 U.S. 224, 58 S.Ct. 162, 82 L.Ed. 213 (1937). At issue was a 50% quota share reinsurance agreement that divided losses between the ceding insurer, Southern Surety Company, and the reinsurer, Fidelity & Deposit Company of Maryland. Southern Surety became insolvent; was placed into liquidation; and the court appointed the New York Superintendent of Insurance, Louis H. Pink, as its liquidator. Fidelity & Deposit refused Pink's demand to pay its 50% share of Southern Surety's losses, reasoning that the reinsurance agreement, as an indemnity contract, obligated it to pay its share only on losses that were *actually paid* by the liquidator. In response, the liquidator contended that the reinsurer was required to pay 50% of the insolvent company's *liability* to claimants, regardless of the amount of losses the insolvent company was actually able to pay. Indeed, the liquidator needed to collect the reinsurance in order to pay the insolvent company's claimants. To allow the reinsurer to stand on the indemnity nature of the reinsurance contract relieved that reinsurer of its payment obligation even though it had collected its share of the premium as consideration for that obligation. The Supreme Court found for the reinsurer.

As a result of the Supreme Court's ruling in *Fidelity & Deposit*, States enacted legislation to assure the non-recurrence of this event. *See, e.g.,* Section 319.1 of The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, *as amended,* 40 P.S. § 442.1.[13] By this legislation, reinsurers are obligated to pay reinsurance proceeds to the liquidator, notwithstanding the indemnity nature of the reinsurance contract. State legislation requires that a reinsurance agreement must contain the so-called "insolvency clause" before the

---

**13.** It provides, in relevant part, as follows:

   (c) No credit shall be allowed as an admitted asset or as a deduction from liability, to any ceding company for reinsurance *unless the reinsurance is payable to such company or its statutory liquidator by the assuming company on the basis of the liability of the ceding company* under contract or contracts reinsured without diminution because of insolvency of the ceding company.

   (d) No such credit shall be allowed for reinsurance unless the reinsurance agreement provides that payment by the company shall be made directly to the ceding company or to its liquidator, receiver, or statutory successor.

40 P.S. § 442.1(c), (d), added by the Act of December 3, 1975, P.L. 474 (emphasis added).

ceding insurer can receive credit on its statutory financial statement for liabilities transferred to the reinsurer. *Legion*, 831 A.2d at 1224. Accordingly, every reinsurance agreement contains the standard Insolvency Clause, which obligates the reinsurer to pay the liquidator on the basis of claim liabilities, not claim payments.

Had there been no Insolvency Clause in the Reinsurance Agreement at issue here, then Reliance would have been required to post reserves on its statutory financial statement for losses expected under the fronting policies issued to Hospitals. *See* Section 319.1 of The Insurance Company Law of 1921, 40 P.S. § 442.1. The 5% fee Reliance collected for acting as the fronting carrier was wholly inadequate for this purpose. A fronting arrangement would never work if the fronting company could not reduce its claim liability to 0% on its statutory financial statement by reason of its 100% reinsurance.

The Privity Clause protects the reinsurer by disallowing a third party to present a claim directly to the reinsurer. Without the Privity Clause, a reinsurer might find itself in a situation where both the ceding company and a policyholder each demand payment on the same claim. This is at odds with the nature of an indemnity contract, where only the insurer is entitled to reimbursement *after* it has paid the claim. Further, the Privity Clause prevents a claimant, left unhappy by the direct insurer's decision on its claim, from trying a second time by presenting the disallowed claim to the reinsurer.

The Insolvency and Privity Clauses are boilerplate provisions that will be found in every reinsurance agreement. Their presence is attributed to the indemnity nature of the reinsurance agreement and to state regulatory law that requires, post-insolvency, that the reinsurer's obligation be defined in terms of the insurer's liability, not

its actual losses or payments. Section 319.1(c) of The Insurance Company Law of 1921, 40 P.S. § 442.1(c). They are used even where a policyholder has a cut-through endorsement, of the type described in the Reliance Guidelines.

### Liquidator's Contract Argument

The Liquidator contends that Hospitals do not satisfy the *Legion* standards and, therefore, the Reliance Guidelines are dispositive. Because the Hospitals were not issued cut-through endorsements, they are not entitled to assert third-party beneficiary rights to the reinsurance proceeds. Accordingly, the Insolvency Clause governs, and it directs that post-insolvency reinsurance proceeds be paid to the Liquidator.

This argument has some logical appeal, but it is flawed in several respects. The Reliance Guidelines are based on one contract provision, the Insolvency Clause. *Legion* established, however, that to determine whether reinsurance payments are assets of the insolvent insurer's estate, one must look at all the provisions in all the operative documents. In addition to this study of how the various contractual provisions fit together, *Legion* requires an examination of how these provisions were applied pre-insolvency.

The Insolvency and Privity Clauses, consistent with the indemnity nature of the Reinsurance Agreement, presume that Reliance was paying Hospitals' claims pre-insolvency and thereafter was reimbursed by AHIC. This was not the case in actual practice, and it could not be the case as a matter of contract. AHIC accepted "100% of the Company's 'ultimate net loss' [on] each and every loss, each and every subject policy." Palm Springs, Exhibit 17 at 5. The Reinsurance Agreement required Reliance to pay AHIC "100% of Company's Gross Net Written Premium," and AHIC allowed Reliance a ceding commis-

sion of "five percent (5%) of the Reinsurance Premium Payable." *Id.* at 6. Without funds to pay claims, Reliance could not, and did not, make the "loss settlements" referenced in the Reinsurance Agreement. *Id.* at 8.

■ The standard provisions of the Reinsurance Agreement are those that will be used in an orthodox insurance arrangement where the direct insurer assumes an actual underwriting risk. It is the absurdly low ceding commission of 5% that reveals that the contractual arrangement between the insurer and reinsurer "extends beyond the realm of traditional insurance." *Mellon,* 5 Phila. Co. Rptr. at 407–408.

The Claims Services Agreement confirms the lack of any claim responsibility in Reliance. The centerpiece is the funding of the Disbursement Accounts, from which all Hospitals' claims were paid. Reliance did not fund the Disbursement Accounts. The responsibility for claims, ranging from the cost of their defense to their final payment, was transferred by the Claims Services Agreement to SCPIE Management. Reliance's obligation to pay for the servicing and payment of claims was "None." In short, this contract also relieved Reliance of any and all liability for claims.

In the context of a reinsurance agreement and a claim servicing agreement that relieved the insurer of liability to pay claims, the standard Insolvency Clause and Privity Clause are rendered meaningless.

The Insolvency Clause prevents a reinsurer from using the indemnity nature of the reinsurance contract to avoid paying its share of claims to any party simply because the ceding company is insolvent. It requires claims to be paid on the basis of the insolvent insurer's liability for claims, as opposed to actual payment of claims. Here, Reliance never made claim payments. Reliance never had liability for claims; this liability was transferred to AHIC.

The Privity Clause is a provision to be invoked by the reinsurer, not the insurer or the insurer's liquidator. Here, AHIC has not invoked the Privity Clause as a defense against Hospitals' claim for payment. Further, in derogation of a literal read of the Privity Clause, AHIC permitted policyholders to submit their claims to AHIC, via its affiliate, SCPIE Management. Reliance never presented claims to AHIC for payment.

To determine the intention of the parties, one must look at all the contracts and operative documents, not just two provisions in one contract. What is lacking here is a provision, in any contract, that provides that in the event of its insolvency Reliance would, for the first time, become liable for the payment of claims. To contract for a transfer of claim liability from AHIC to Reliance, in the event Reliance became insolvent, would be absurd from either party's point of view.

Finally, boilerplate contract clauses are not dispositive of a claim to be a third-party beneficiary of a contract or series of contracts. As established in *Guy,* 501 Pa. 47, 459 A.2d 744, and in *Legion,* 831 A.2d 1196, the totality of the circumstances will determine what was intended by the parties. This requires that we consider the fact that the contracts established that Reliance had no liability for claims pre-insolvency or post-insolvency. In the absence of such liability, we reject the Liquidator's argument that two provisions in the Reinsurance Agreement are dispositive, thereby making funds intended exclusively to pay Hospitals' claims to be assets of the Reliance estate.

### Third–Party Beneficiary Test

■ As explained in *Legion,* the question of whether a policyholder can demon-

strate that it has third-party beneficiary rights to a reinsurance agreement requires an examination of the facts of each case. Accordingly, we must examine the "circumstances" of the Hospitals' claims to determine whether the parties' intentions can be effected by recognizing that Hospitals are the true beneficiaries of the Reinsurance Agreements. *Scarpitti*, 530 Pa. at 372, 609 A.2d at 150. In doing so, we follow the analysis employed in *Legion*.

■ Hospitals' evidence establishes that Reliance acted solely as a fronting company for AHIC; it did so to generate fees as opposed to premium revenue; and AHIC functioned as Hospitals' direct insurer with respect to the handling and funding of claims. On these three factors, there is no real disagreement between the parties.[14] They part company on the other two factors, *i.e.*, whether Reliance, or Hospitals, chose the reinsurer and whether the equities favor Hospitals' claim.

With respect to the choice of reinsurance, the Liquidator contends that "the reinsurer's involvement" in Hospitals' program of insurance was not "facilitated" by Hospitals. Liquidator's Memorandum of Law in Opposition to Summary Judgment at 23. The Liquidator also argues that the *Legion* holding should be limited to the situation where the policyholder seeking direct access to reinsurance is the only risk in the insurance program, as opposed to one of many risks. Here, Hospitals represent just two of the many hospitals insured in the Sullivan Kelly program.

In support of this argument, the Liquidator makes several factual points. He notes that Hospitals did not direct the negotiations between Reliance and SCPIE Management or AHIC; that Hospitals were not present at, or involved in, the creation of their insurance programs; and that Hospitals did not have the ability to veto the placement of coverage with either AHIC or Reliance. These facts may be true, but they are not relevant to the question of whether it was Hospitals, by their broker, Sullivan Kelly, that chose AHIC. More importantly, Reliance had nothing to do with Sullivan Kelly's choice of SCPIE, and on this point there is no dispute.

In the normal situation, when policyholders choose their insurer, they do not even know of the existence of reinsurance. *See, e.g., Housing Authority of Lebanon County v. Envirohousing, Inc.*, 442 F.Supp. 1193, 1196 (M.D.Pa.1977). The reinsurer's identity, if known at all by the policyholder, is irrelevant to that policyholder's decision to purchase insurance from a particular carrier. In *Legion*, however, the Policyholder Intervenors accepted the programs developed by their brokers after being persuaded that the reinsurer, which was intended to function as the direct insurer, had the requisite expertise and financial strength to handle their program successfully. It was Legion's identity that was obscure. Legion was not chosen by American Airlines, or its broker Aon, because of its experience in underwriting airline risks. It was cho-

---

**14.** Further, the presence or absence of any one factor is not dispositive. Courts are to review

> the special circumstances attending its creation, ... the nature of the transaction itself, or ... any rule of public policy, that would justify us in saying that the contract was any other than a contract of reinsurance.

*Appeal of Goodrich*, 109 Pa. 523, 530, 2 A. 209, 212 (1885). The reinsurance arrangement between AHIC and Reliance was not done for the usual purposes: to allow Reliance to expand its malpractice insurance business and to stabilize its claims and prices. Reliance was not doing the business of malpractice insurance but, rather, renting its license.

sen for one reason: it had a license in all 50 states. Aon sold American Airlines on the program precisely because of the reinsurers' history of writing airline coverage on a direct basis in Europe. *Legion,* 831 A.2d at 1217.

The Liquidator misapprehends *Legion* as requiring the policyholder to "facilitate" the placement of its risk with the reinsurer. The Liquidator understands *Legion* to mean that the policyholder must be in a position to choose one reinsurer over another reinsurer. This is not correct. The import of *Legion* is that the policyholders chose the program because of the reinsurer's involvement, not because of Legion's involvement. The Policyholder Intervenors accepted the broker's program recommendation because of the capabilities of the reinsurer, whereas the capabilities of Legion were unknown or irrelevant. This is what was meant by the statement that the Policyholder Intervenors "chose their reinsurance as the intended source of their coverage." *Legion,* 831 A.2d at 1244.

When Hospitals chose to place their coverage with the Sullivan Kelly program, they did so because of SCPIE's expertise in medical malpractice and the financial strength of its insurance company subsidiaries. Hospitals could have refused SCPIE and placed its coverage elsewhere, even with Reliance, which marketed its own competing medical malpractice insurance program.[15] The real point is that in 1996 when Hospitals chose to remain in the Sullivan Kelly program after Farmers withdrew, they did so because they were satisfied with the replacement for Farmers, *i.e.,* a SCPIE insurer. Reliance was involved as a temporary participant, willing to rent its license or authorization to write insurance business in a particular state.

Finally, the *Legion* principles are not limited, as argued by the Liquidator, to those policyholders covered by a stand-alone, single risk program, such as that of American Airlines or Pulte Homes, who were Policyholder Intervenors in *Legion.* The psychiatrist members of Psychiatrists Purchasing Group (PPG) were covered through a program very similar to that of Sullivan Kelly. Indeed, the parallels between PPG and Sullivan Kelly are striking: each entity set out to fashion an effective, nationwide program of medical malpractice insurance for a specific segment of the healthcare industry. In the case of PPG, it was psychiatrists; in the case of Sullivan Kelly, it was hospitals. Further, the holdings in *Venetsanos, Mellon, Guy* and *Reid* do not support the Liquidator's argument that third-party beneficiary rights can be exercised only by a policyholder in a single risk program.

The facts surrounding Hospitals' insurance program cannot be distinguished, in any meaningful way, from those of the Policyholder Intervenors in *Legion.* There, the Court explained:

---

15. The Liquidator argues that the insurance programs considered in *Legion* were tailored to the needs of each Policyholder Intervenor. This can also be said of any insurance policy. Individual consumers choose the types and limits of their coverage even in a simple auto insurance policy depending on the riders and endorsements attached to the policy. COUCH ON INSURANCE 3D § 18:17 (2005) (riders and endorsements expand or restrict coverages in the policy). In any case, the policies issued to each hospital in the Sullivan Kelly program were individually tailored to the risk; this was one of the services provided by SCPIE Management. Finally, there is nothing in the *Legion* holding to suggest that the fronting policy issued to each Policyholder Intervenor was, itself, a unique policy. It is a safe assumption that the medical malpractice policies issued by Legion to each psychiatrist in the Psychiatrists Purchasing Group (PPG) were not dissimilar from the medical malpractice policies issued by Reliance to Hospitals.

The Policyholder Intervenors, through their consultants and agents, chose their reinsurers as the intended source of their coverage. The fronting company was the last party to the transaction; its identity was not even known until after the reinsurance was placed and all material terms decided by the Policyholder Intervenors and their reinsurers.

*Legion*, 831 A.2d at 1241. Hospitals, by their consultants, Sullivan Kelly, chose AHIC to function as Hospitals' medical malpractice insurer. All the material terms of Hospitals' insurance program, *i.e.*, the policy terms, pricing, underwriting and claims handling were designed by Sullivan Kelly, not by Reliance, on behalf of its program members. Reliance was the last party to the table, and it did not make a single substantive decision about the insurance program. In sum, Hospitals have made their case that they chose the program because AHIC, not Reliance, would function as their direct insurer.

■ This leads to the final factor, which is whether the equities favor direct access. In response to Hospitals' observation that there is no guaranty fund coverage, the Liquidator notes that Hospitals knew, or should have known, of the absence of this protection when they chose the Sullivan Kelly program. However, the issue of the equities goes beyond Hospitals' lack of guaranty fund coverage. The reasonable expectations of the parties are also relevant to the inquiry into the equities.

The Reliance Liquidator reads *Legion* to mean that the Policyholder Intervenors must be the moving force in the creation of their program of insurance. As noted, this argument misapprehends what was meant in *Legion* by the Court's observation that the Policyholder Intervenors chose the reinsurer. More importantly, the Liquidator's argument overlooks the point emphasized in *Legion* that, as a fronting company, Legion did nothing except to serve as a pass-through of premiums and claims. That is the situation here.[16]

The Reinsurance Agreement and the Claims Services Agreement relieved Reliance of having to pay for the handling of claims or to fund the claim payment accounts, *i.e.*, the Disbursement Accounts. Palm Springs, Exhibit 19, at 25 (describing the fees and charges to be paid by Reliance for services provided under the Claims Services Agreement as "None."). Lest there be any doubt, Reliance's witness described Reliance's involvement in Hospitals' claims as "nil" or "none" and that "[e]verything [went] through SCPIE." Palm Springs, Exhibit 1, Beckham Deposition at 71–72. Funds placed in the Disbursement Accounts were required to remain there until "each claim shall have been paid."[17] Palm Springs, Exhibit R at 4. Effectively, the Liquidator demands that those funds now be transferred to the Reliance estate to pay claims, in contravention of the Claims Services Agreement.

Likewise, Reliance "delegated the policy issuance function ... to SCPIE." Palm Springs, Exhibit 2, Slaton Deposition at 103. Reliance provided 60 signed signature pages to SCPIE to attach to the

---

**16.** However, Reliance did not even act as a pass-through of claims.

**17.** After Reliance took its 5% fee, the remaining 95% of the premium was remitted to SCPIE Management. This 95% portion of the premium was used to pay SCPIE Management for services provided under the Claims Services Agreement and to fund the Disburse- ment Accounts referenced therein. AHIC took the insurance risk that those funds might not be adequate to pay all claims. It would also enjoy an underwriting profit if funds were remaining in the Disbursement Accounts. The funds remained under the control of SCPIE Management until all losses for a policy period were resolved.

policies SCPIE issued. Palm Springs, Exhibit 33. The "due diligence" on whether to accept an individual hospital risk was done by SCPIE, in accordance with underwriting standards established by SCPIE and Sullivan Kelly.[18] Reliance did not even receive a copy of a hospital's application for coverage with the program. As to pricing, Reliance explained: "If we're not going to keep the risk, we are not going to tell them the price." Palm Springs, Exhibit 2, Slaton Deposition at 51. Pricing, again, was done by Sullivan Kelly and SCPIE.

This recital of what Reliance did *not* do bears directly on the equities, and they do not favor the Liquidator. The Reliance fronting arrangement for AHIC terminated in 1999, two years before Reliance became insolvent. Reliance had been fully compensated for the use of its license or what Reliance itself described as "its limited administrative involvement." Palm Springs, Exhibit 36. When asked whether the SCPIE Program was profitable, Reliance's witness replied that from "a Reliance [perspective] as a pure front, I would presume it was profitable." Palm Springs, Exhibit 2, Slaton Deposition at 62. The Reliance Liquidator has offered no contrary evidence.

To have AHIC pay Reliance post-insolvency would completely revise the arrangement between AHIC, Reliance and Hospitals. Reliance would be authorized to seize the 95% portion of the premium paid by Hospitals that was never intended to be used by Reliance. The 95% of premium was intended only for the handling and funding of Hospitals' claims. This is not equitable, and it is not consistent with the intent of the parties.

The equities favor Hospitals for another reason—the absence of guaranty fund coverage. *See Legion,* 831 A.2d at 1246–1247. Because Reliance of Illinois, the insurer that issued the Hospital's policies, was a surplus lines insurer, its policies were not backed up by guaranty fund protection. In addition, many states have net worth limitations on persons seeking guaranty fund protection, even where the policy is issued by a licensed carrier. *Legion,* 831 A.2d at 1206. Institutional policyholders, such as hospitals, are likely to exceed the net worth limits in the states that have such limits.

■ In sum, the circumstances favor Hospitals' claim that they should be treated as third-party beneficiaries of the Reinsurance Agreements. This will allow the program to continue to operate as it did before Reliance's insolvency by having AHIC pay for Hospitals' claims arising from the two-year period when Reliance acted as the fronting carrier. Hospitals have made their case because: (1) Reliance acted only as a fronting company in which capacity it did not accept an underwriting risk; (2) Reliance entered the transaction to generate fee income not premium revenue; (3) AHIC functioned as the direct insurer by funding and processing claims through its affiliate, SCPIE Management; (4) Hospitals chose the Sullivan Kelly program because of AHIC's participation not because of Reliance's minimal participation as a fronting company; and (5) the equities favor Hospitals' claim for direct access.

---

**18.** The facultative nature of the Reinsurance Agreements allowed AHIC to decline an individual risk presented by Sullivan Kelly. Facultative contracts are "generally related to a specific, insured risk." STRAIN, at 427. Facultative reinsurance contracts are "the most vulnerable area for piercing the principle of privity of contract between the reinsurer and the ceding company." *Id.* at 428.

### Conclusion

The Reinsurance Agreement and the related agreements established a Potemkin Village rendition of an orthodox insurance arrangement. The parties always understood that AHIC, and not Reliance, would be responsible for payment of the claims. For the Liquidator to demand that he is entitled to be compensated for claim liability when his predecessor-in-interest, Reliance, never could or did when it was solvent, would completely up-end the arrangement designed by Sullivan Kelly. Effectively, it is the Liquidator that seeks a novation, by demanding that Reliance become the actual, as opposed to the fronting, insurer for the sole reason that Reliance has become insolvent.[19]

Accordingly, we grant Hospitals' motions for summary judgment.

### *ORDER*

AND NOW, this 4th day of September, 2009, the motions for summary judgment filed by Palm Springs General Hospital and Baptist Health South Florida, Inc. are hereby GRANTED.

---

**19.** In light of our disposition of this case, we do not address the legal issue of novation raised by Hospitals.